## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KENIA LEIVA,

               Plaintiff,

               v.

CITY OF TRENTON, et al.,

               Defendants.

Civil Action No. 13-5136 (MAS) (DEA)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

On July 5, 2018, the Court entered Default Judgment in favor of Plaintiff Kenia Leiva ("Plaintiff" or "Ms. Leiva"), and against Defendant Victoria Berrios ("Defendant" or "Ms. Berrios"). (ECF No. 43.) Subsequently, on February 25, 2021, the Court held a Proof Hearing to determine the appropriate amount of damages to award Plaintiff pursuant to Federal Rule of Civil Procedure 55(b)(2)(B). (ECF No. 59.) On March 9, 2021, Plaintiff submitted a Certification in Support of Plaintiff's Request for Attorney's Fees. (ECF No. 60.) For the reasons articulated below, the Court grants Plaintiff an award of $360,011.02.

### I.     BACKGROUND

Ms. Leiva filed her Complaint on August 27, 2013. (Compl., ECF No. 1.) In her Complaint, Ms. Leiva alleged that Defendant—then an off-duty Trenton police officer—taunted, stalked, and attacked her (*id.* ¶¶ 5, 12–21, 27), which led to physical, mental, and emotional injuries (*id.* ¶¶ 38–40). Specifically, Ms. Leiva alleged that Defendant's attack resulted in "numerous bruises, contusions[,] and [the] surgical removal of a piece of jewelry" in the ensuing days, plus "near

constant headaches" thereafter. (*Id.* ¶ 39.) Furthermore, Ms. Leiva alleged that she suffered from "psychiatric ailments, . . . uncontrollable anxiety[,] and [received] a diagnosis of Post-Traumatic Stress Disorder [('PTSD')] due entirely to Defendant's assault upon [her] person." (*Id.* ¶ 40.) In the years after she filed her Complaint, Ms. Leiva posits that these various physical, mental, and emotional injuries developed into "depression and fibromyalgia, resulting in severe physical pain, and irritable bowel syndrome." (Suppl. Damage Submission 4, ECF No. 55.)

The Court ultimately granted Default Judgment in favor of Plaintiff.[1] After several adjournments, the Court conducted a Proof Hearing on February 25, 2021.

At the Proof Hearing, Ms. Leiva's testimony detailed Defendant's attack and the extent of her damages resulting therefrom. (*See generally* Proof Hr'g Tr.) Ms. Leiva testified that she was returning from karaoke with a friend one night in August 2011 when she encountered Defendant in a parking lot while stopping to pick up an additional friend on the way home. (*See id.* at 6:5–13, 9:14–15.) Ms. Leiva testified that upon arrival and beeping her horn, Defendant began

---

[1] The Court rendered Default Judgment upon Plaintiff's claim alleging a violation of 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff [1] must allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *Barna v. Perth Amboy*, 42 F.3d 809, 815 (3d Cir. 1994) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Here, there was a clear violation of a constitutional right: Ms. Berrios, then a police officer, assaulted a private citizen in her own home. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST., amend IV. Further, "when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)); *accord Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021). Additionally, the record adequately alleges that Defendant acted under the color of state law when Ms. Berrios showed her badge to a bouncer and loudly declared that she was a police officer at the outset of the parking-lot assault. (Compl. ¶ 17; Proof Hr'g Tr. 6:21–22); *see Barna*, 42 F.3d at 816 ("[O]ff-duty police officers who purport to exercise official authority will generally be found to have acted under color of state law. Manifestations of such pretended authority may include flashing a badge [or] identifying oneself as a police officer."). As such, Plaintiff stated a claim upon which default judgment was appropriately granted.

screaming profanities and threatening to assault her, then Defendant declared herself as a police officer and showed her badge to a bouncer when he tried to intervene. (*Id.* at 6:12–24; *accord* Compl. ¶ 17.)

Ms. Leiva further testified that when she tried to drive away from the scene, Defendant pursued her in Defendant's vehicle. (Proof Hr'g Tr. 6:25–7:4.) When Ms. Leiva briefly pulled over, Defendant came to her car door and "tr[ied] to open the door, . . . hit [Ms. Leiva's] window," and threatened to kill her again. (*Id.* at 7:15–21.) Ms. Leiva then drove off again towards her home and signaled a police cruiser which she passed on the way. (*Id.* at 8:17–19.) Ultimately, Defendant followed Ms. Leiva to her home, blocked her vehicle, and began pushing Ms. Leiva. (*Id.* at 7:24–8:5.) A friend who was with Ms. Leiva tried to usher her to safety inside Ms. Leiva's house, but Defendant followed, until eventually Defendant "was inside [Ms. Leiva's] house." (*Id.* at 8:5–10.) Ms. Leiva testified that once Defendant was just inside of her house, Defendant "was hitting [her] face [and] kicking [her] legs." (*Id.* at 8:8–9.) Ms. Leiva and her friend finally managed to close the door on Ms. Berrios and pause the assault for a minute or two. (*Id.* at 9:6–10.)

Only after this initial salvo did officers from the Trenton Police Department arrive and intervene. (*Id.* at 9:8–9.) Despite the officers' presence, Defendant again "r[a]n and start[ed] . . . hitting [Ms. Leiva.]" (*Id.* at 9:19–10:7.) Ms. Leiva testified that this follow-up attack lasted several minutes and that the on-duty police officers did not stop Ms. Berrios's attack. (*Id.* at 9:22–10:6.) Defendant was not detained or otherwise arrested that night. (*Id.* at 9:19–10:7.) Finally, Ms. Leiva was taken to the hospital due to her injuries. (*Id.* at 14:1.) Doctors conducted CAT scans, gave her pain medicine, and referred her to a specialist to remove her nose piercing. (*Id.* at 14:14–17.)

After recounting her attack, Ms. Leiva also testified as to the short- and long-term injuries she sustained as a result of the incident. As for physical injuries, Ms. Leiva testified that Defendant

"hit [her] so many times in [the] nose that [her] nose was bleeding and [her] piercing was stuck in [her] nose." (*Id.* at 10:22–25.) The injury required surgical intervention in the form of "a little cut [so that the doctor could] pull out the piercing on [Ms. Leiva's] nose." (*Id.* at 11:18–25, 12:13–20.) Additionally, Ms. Leiva testified, her mouth was swollen, and her face and legs were bruised from the attack. (*Id.* at 11:14–16.) Although most of her physical symptoms resolved in a week or two, Ms. Leiva testified that she still suffers from daily headaches as a result of the attack. (*Id.* at 11:17–18, 15:2–12.) Further, Ms. Leiva asserted that she now suffers from fibromyalgia and irritable bowel syndrome triggered by psychological trauma related to the attack. (*See id.* at 23:25–26:4.) Her fibromyalgia results in significant daily pain. (*Id.* at 24:24–25:1.)

As to Ms. Leiva's mental and emotional damage, Ms. Leiva testified that immediately following the incident, she began experiencing "panic attacks, anxiety, [and] hyper ventilation[.]" (*Id.* at 15:13–18.) Sometime in late 2011, Ms. Leiva was diagnosed with PTSD. (*Id.* at 28:5–7.) She particularly struggled with the idea that Defendant "knows where [she] live[s]" and that Defendant could "do something else" to her. (*Id.* at 15:17–24.) This feeling of being unsafe in her own home as a result of Defendant's attack was so severe that it caused Ms. Leiva to move residences following the incident. (*Id.* at 15:19–22, 18:14–19:7.) Ms. Leiva testified that to this day, she continues to suffer from memory problems, depression, anxiety, nightmares, flashbacks, sleep loss, anxiety, and panic as a result of Defendant's attack. (*See id.* at 26:5–29:12.)

Ms. Leiva testified that, to help with her mental and emotional difficulties, she began attending therapy twice per week after the assault. (*Id.* at 15:14–16, 21:16–24.) She currently still attends therapy, although she reduced her sessions to once per week. (*Id.* at 22:2–9.) She largely credits medication and therapy for her improvement in coping. (*Id.* at 22:6–9, 27:12–19.)

Ms. Leiva is prescribed her medication by a psychiatrist, whom she visits approximately once every three months. (*See id.* at 22:6–9.) This psychiatrist, Ms. Leiva testified, has prescribed medication for depression, fibromyalgia, and various symptoms associated with her PTSD. (*Id.* at 22:17–23:24.) When she stops taking her medication, she suffers from "headaches, nause[a], [hot] flash[es], . . . [and] dizz[iness]." (*Id.* at 23:13–24.)

Ms. Leiva testified that, before the attack, she: did not have panic attacks or anxiety; ran eight miles every morning; and played soccer without pain. (*Id.* at 20:8–10, 26:21–23, 27:2–6.) Yet today, she cannot even play with her children because of the physical pain stemming from fibromyalgia. (*See id.* at 29:5–12.) In sum, Ms. Leiva testified that the negative effects of Defendant's attack have "changed [her] life forever." (*Id.* at 29:4.)

In support of her Motion for Default Judgment, Plaintiff submitted the following documents pertaining to damages: (1) a prescription record representing expenses for medications made necessary by the attack; (2) a bill for the surgery Ms. Leiva underwent for her embedded facial piercing following the attack; (3) a bill for a follow-up visit for the surgery; (4) a bill for radiologic services rendered following the attack; (5) a bill incurred by Plaintiff after receiving her emergency treatment following the attack; (6) a treatment record reflecting Ms. Leiva's fibromyalgia, PTSD, and irritable bowel syndrome diagnoses; (7) further records reflecting Ms. Leiva's fibromyalgia, PTSD, and irritable bowel syndrome treatments; and (8) documentation pertaining to Plaintiff's emotional distress and counseling as recent as March 2, 2016. (*See* Suppl. Damage Submission, Exs. G–N.) All of these documents were considered in the Court's damages findings recounted below.

## II.    DISCUSSION

Plaintiff requests the Court award $650,000 in compensatory damages, $2.5 million in punitive damages, $2,563.02[2] in medical expenses, and $12,927.60 in attorney's fees. (Suppl. Damage Submission 2.) For the reasons discussed below, the Court finds that a compensatory damages award of $50,000 for pain and suffering and a punitive damages award of $300,000 is appropriate.[3] The Court also finds sufficient proof was submitted to substantiate the $2,563.02 in medical expenses. Finally, the Court awards $7,448 in attorney's fees. This results in a total award of $360,011.02.

### A.    Compensatory Damages

"[T]he basic purpose of a [Section] 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." *See Carey v. Piphus*, 435 U.S. 247, 254 (1978); *see also Calhoun v. Yamaha Motor Corp.*, *U.S.A.*, 216 F.3d 338, 347 (3d Cir. 2000) ("The purpose of compensatory damages is to make the plaintiff whole." (internal quotation marks and citation omitted)). Pain and suffering damages are a compensatory mechanism that can help compensate a plaintiff for mental and physical pain caused by a past attack. *See Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 544 (1994) ("Although pain and suffering technically are mental harms, these terms traditionally have been used to describe sensations stemming directly from a physical injury or condition." (internal quotation marks and citation omitted)). To calculate a reasonable

---

[2] Plaintiff lists $1,563.72 in medical expenses in both the "total amount" and "expenses claimed" charts in her Supplemental Damages Submission. (Suppl. Damage Submission 2, 6–7.) However, the individual entries within the "expenses claimed" chart totals an amount of $2,563.02. (*See id.* at 6–7.) The Court thus utilizes the $2,563.02 figure as the proper amount for medical expenses.

[3] Hereinafter, the Court will refer to Plaintiff's request for both emotional distress and pain and suffering as just "pain and suffering." *See Truchan v. Nutley Police Dep't*, No. 15-324, 2017 WL 1968386, at *7 (D.N.J. May 12, 2017) ("Claims of emotional distress are included in the term 'pain and suffering.'") (citations omitted).

6

pain and suffering damages award, however, the Court can only consider the evidence before it. *See MacRae v. Afro-Am. Co.*, 274 F.2d 287, 287–88 (3d Cir. 1960) ("Compensatory damages, as the name implies, may be awarded against the defendant to compensate the plaintiff for actual harm the plaintiff has suffered."). In this sense, "[u]nlike the factual allegations of the Complaint that are assumed to be true for the purpose of proving liability, the plaintiff must prove the amount of damages." *Days Inns Worldwide, Inc. v. Amar Shakti Enters., LLC*, No. 18-8011, 2019 WL 3423433, at *5 (D.N.J. July 30, 2019) (citing *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990)); *see also Possumato v. Jones*, No. 14-155, 2016 WL 8291973, at *2 (D.N.J. Nov. 4, 2016) ("The Court is not required to accept [p]laintiffs' allegations relating to damages as true and it 'has considerable latitude in determining the amount of damages.'" (citation omitted)). Having conducted its analysis upon the evidence Plaintiff provided, the Court finds that $50,000 in damages is appropriate, as opposed to the $650,000 proposed by Plaintiff.

The Court recognizes that Defendant caused Ms. Leiva significant harm. First, Ms. Leiva suffers from, and is medicated for, anxiety and PTSD as a result of Defendant's attack upon her. (Compl. ¶ 40; Suppl. Damage Submission, Ex. N, *24; Proof Hr'g Tr. 22:17–23, 28:5–16.) Second, she now suffers from memory problems, depression, panic attacks, nightmares, and sleep loss. (Proof Hr'g Tr. 26:5–29:12.) At the Proof Hearing, Ms. Leiva also testified that because of these conditions, she regularly attends therapy and has done so since 2011. (*Id.* at 20:19–22:8.) Ms. Leiva provided the Court with documentation evidencing this counseling through March 2, 2016. (*See* Suppl. Damage Submission, Ex. N.) Thus, Ms. Leiva's counseling, coupled with her documented medication for PTSD and anxiety, provide a powerful basis for the Court to award compensatory damages for mental pain and suffering stemming directly from Defendant's attack.

In reaching its pain and suffering determination, the Court notes that Plaintiff did not persuade the Court that her alleged long-term physical damages are a proximate result of Defendant's attack. (*See* Proof Hr'g Tr. 23:25–26:4.) Particularly, the Court cannot gauge whether Ms. Leiva's fibromyalgia and irritable bowel syndrome were caused by Defendant's conduct in 2011. (*Id.*) While it is surely plausible that Plaintiff's psychological trauma endured because of the attack contributed to her fibromyalgia, it is also plausible that genetics, infection, or other causes of fibromyalgia resulted in her condition. Without any affirmative indication from medical professionals linking the 2011 attack to Ms. Leiva's current fibromyalgia upon the record, the Court cannot reasonably formulate such pain into its damage award. *See Looi v. Wang*, No. 13-1684, 2015 WL 64650, at *2 (D.N.J. Jan. 5, 2015) ("The Court must be satisfied by a preponderance of the evidence that damages should be awarded." (citations omitted)); *Cf. Malik v. Hannah*, 661 F. Supp. 2d 485, 493–94 (D.N.J. Sept. 24, 2009) (reducing plaintiff's $2,000,000 request for pain and suffering damages from a police officer's assault to $30,000, where the court noted that plaintiff's belief that the incident led to a permanent back injury was "[un]supported by a medical diagnosis"); *Cf. Arpaio v Dupre*, No. 08-3548, 2011 WL 831964, at *7 (D.N.J. Mar. 3, 2011) (providing an example where a plaintiff was successful in proving causation where she provided a report from a psychologist concluding "that as a result of Defendant[']s actions" the plaintiff developed PTSD). Similarly, the Court cannot reasonably factor Ms. Leiva's struggles with irritable bowel syndrome into its damage award calculation for the same reason: an inability to causally link Defendant's attack to Ms. Leiva's irritable bowel syndrome without proper medical diagnosis on the record to support such a claim.

For the above reasons, on the testimony and documentation provided, the Court finds that an award of damages in the amount of $50,000 for past and future pain and suffering is fair, well-

substantiated, and adequate compensation to Ms. Leiva for the difficulties she has suffered at the hands of Defendant.

### B.     Punitive Damages

"Punitive damages may [also] properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) (citations omitted). Punitive damages are appropriate to award in the context of a 42 U.S.C. § 1983 claim where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Here, the Court finds that punitive damages are appropriate because Defendant acted recklessly and with callous indifference toward Ms. Leiva's federally protected rights. First, Defendant's misconduct began when she verbally assaulted Ms. Leiva in a parking lot. (Proof Hr'g Tr. 6:11–16.) To prevent a bouncer from intervening, Defendant, though off-duty, showed her police badge and declared that she was a police officer. (Compl. ¶ 17; Proof Hr'g Tr. 6:18–22.) As the attack continued, Ms. Leiva tried to drive away, only to have Defendant follow in pursuit. (Proof Hr'g Tr. 6:25–7:13.) Next, Defendant followed Ms. Leiva to her home, where she entered and attacked Ms. Leiva. (*Id.* at 7:25–8:10.) This extended spate of unlawful conduct by Defendant is more than just a momentary lapse in judgment. It is a serious violation of a federally protected right and should therefore be punished through an imposition of punitive damages.

Having determined that punitive damages are proper here, the Court must now decide what amount is appropriate. "In our federal system, [s]tates necessarily have considerable flexibility in determining the level of punitive damages that they will allow . . . ." *Gore*, 517 U.S. at 568. In issuing such awards, however, this Court must be careful to comport with due process, by ensuring

that the award is not "grossly excessive or arbitrary."[4] *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

The defendant's reprehensibility is the "most important indicium" for determining a reasonable punitive damages award. *Gore*, 517 U.S. at 575. Factors to consider when determining the degree of reprehensibility include whether: (1) the harm was "physical as opposed to economic"; (2) defendant "evinced an indifference to or reckless disregard of the health or safety of others"; (3) "the target of the conduct had financial vulnerability"; (4) the conduct was a single incident or a series of incidents; or (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Wade v. Colaner*, No. 06-3715, 2010 WL 5479629, at *30 (D.N.J. Dec. 28, 2010) (internal quotation marks omitted) (quoting *Campbell*, 538 U.S. at 419).

As the Court has previously discussed, Defendant's actions were reprehensible. Defendant caused physical and emotional harm when she recklessly disregarded Ms. Leiva's health and safety. Further, the series of confrontations comprising Defendant's conduct was intentional and no mere accident. As a result, the Court finds that a punitive damage award of $300,000 is appropriate because it sufficiently punishes Defendant, deters similar reprehensible conduct in the future, and comports with due process.

---

[4] There is no "simple mathematical formula" for determining the "bright line between the constitutionally acceptable and the constitutionally unacceptable" awards of punitive damages. *Gore*, 517 U.S. at 582, 583. The Supreme Court has also "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 424 (citation omitted). "Rather, the ratio of punitive damages to the harm caused by the defendant is a tool to ensure that the two bear a reasonable relationship to each other." *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 233–34 (3d Cir. 2004) (citations omitted). "While few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process, . . . greater ratios may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 234 (internal quotation marks and citations omitted).

## C. Attorney's Fees

Finally, Ms. Leiva requests attorney's fees totaling \$12,927.60. This Court finds an award of attorney's fees appropriate in this matter. The Court, however, calculates that \$7,448.00 is reasonable based on the evidence provided.

### 1. Lodestar Award

Section "1988 [] allows the award of 'a reasonable attorney's fee' to 'the prevailing party' in various kinds of civil rights cases, including suits brought under § 1983." *Fox v. Vice*, 563 U.S. 826, 832–33 (2011).[5] Under § 1988, in determining what constitutes a "reasonable attorney's fee," the Third Circuit pioneered the "lodestar approach." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010) (citing *Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168 (3d Cir. 1973)); *Dee v. Borough of Dunmore*, 548 F. App'x 58, 60 (3d Cir. 2013) (articulating that "[t]here is a strong presumption that the lodestar is a reasonable fee"). Under the lodestar approach, "court[s] determine[] an attorney's lodestar award by multiplying the number of hours he or she reasonably worked on a client's case by a reasonable hourly billing rate for such services given the geographical area, the nature of the services provided, and the experience of the lawyer." *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 773 (3d Cir. 2019) (also discussing the "percentage-of-recovery method" but articulating that such method "is more complex [and g]enerally used in common fund cases" as opposed to statutory fee-shifting cases like this one); *see also Dee*, 548 F. App'x at 60 ("Attorney fee awards pursuant to § 1988 are based on the lodestar, which is the product of the attorney's hours and rate.").

---

[5] A prevailing party in the attorney's fees context is defined generally as a party that "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). As this Court rendered default judgement in favor of Ms. Leiva, she is therefore a prevailing party for purposes of her 42 U.S.C. § 1983 claim.

11

In calculating the lodestar, "[t]he [Plaintiff] must produce evidence that the hours spent and rate charged are reasonable." *Dee*, 548 F. App'x at 60. Specific to this inquiry, the court "should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001) (quoting *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990)).

Ms. Leiva's attorney ("Plaintiff's Counsel") produced a Certification with the number of hours worked on Ms. Leiva's case and an explanation of why her calculation for the hourly rate charged is reasonable.[6] (*See* Fee Cert., ECF No. 60.) First, Plaintiff's Counsel offered evidence that she worked 26.6 hours on Ms. Leiva's case. (*Id.* ¶ 13.) Based on Counsel's attachment documenting her hours worked, the Court finds this to be the appropriate number of hours worked to calculate the lodestar. (*Id.*, Ex. A.)

Second, Plaintiff's Counsel provided this Court with her assessment as to "a reasonable hourly billing rate for [her] services given the geographical area, the nature of the services provided, and the experience of the lawyer." *S.S. Body Armor*, 927 F.3d at 773 (quoting *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)). Specifically, Plaintiff's Counsel provided that in the Philadelphia market, Community Legal Services attorneys of Plaintiff's Counsel's experience level typically charge hourly rates between $280–$360 per hour. (Fee Cert. ¶ 15.) Plaintiff's Counsel further provided that she has been practicing law since 2015. (*Id.* ¶ 3.)

---

[6] There would be no hourly rate charged in this case, as Plaintiff had a contingency fee arrangement with counsel. This, however, does not change the lodestar analysis. Rather, this fact would only affect any enhancement analysis, as addressed later in this Memorandum Opinion. *Cf. Wade v. Colaner*, No. 06-3715, 2010 WL 5479625, at *8–9, 11 (D.N.J. Dec. 28, 2010).

12

By the Court's calculation, her experience level is between five and six years, depending on what month she began practicing in 2015.[7]

The $280–$360 per hour range provided by Plaintiff's Counsel represents the hourly fee range for "[a]ttorneys [with] 6-10 year[s] experience." (Fee Cert., Ex. B.[8]) The hourly fee range for "Attorneys [with] 2-5 year[s] experience" is $230–$275 per hour. (*Id.*) Presumedly then, considering Plaintiff's Counsel is between her fifth and sixth year of practice, a reasonable hourly rate is between $275–$280 per hour. Plaintiff's Counsel, however, provides "[b]ased on the fact that my practice has a substantial focus on civil rights, it is respectfully submitted that an appropriate hourly fee is $360.00 per hour." (*Id.* ¶ 16.)

Plaintiff's Counsel provided no cases to support her assertion that a substantial focus on civil rights practice justifies the maximum hourly rate for an attorney with six to ten years of experience in the Philadelphia area. Instead, the evidence Plaintiff's Counsel submitted shows only that Community Legal Services attorneys of her experience level, five to six years, presumedly charge a lower hourly rate than the $360 per hour requested. *Wade*, 2010 WL 5479625, at *4 ("Courts may not make any findings of reasonableness based on a generalized sense of appropriateness, but must rely on the record."); (*see* Fee Cert., Ex. B (providing that an attorney with five years of experience falls in the range of attorneys with 2–5 years of experience, which, at maximum, bills at a rate of $275 per hour.))

---

[7] As Defendant is in default in this case, the Court's only focus will be on whether the requested lodestar rate is reasonable, not whether a reduction of the requested rate is warranted. *See Wade*, 2010 WL 5479625, at *4 ("the Court may not reduce an award *sua sponte*; rather, it can only do so in response to specific objections made by the opposing party.").

[8] While the hourly fee ranges are cut-off on the document attached as Exhibit B to the Fee Certification, the complete document is found on the Community Legal Services of Philadelphia's website. (*Explanatory Notice to the Public*, COMMUNITY LEGAL SERVICES OF PHILADELPHIA: ATTORNEY'S FEES (eff. July 1, 2018), https://clsphila.org/about-community-legal-services/attorney-fees/).

Significantly, "[t]he party seeking attorney's fees bears the burden to prove the reasonableness of the fee request." *Wade*, 2010 WL 5479626, at \*4.[9] The Court has great respect for the work that civil rights attorneys perform. In addition, Plaintiff's Counsel diligently represented Ms. Leiva during this protracted matter, particularly during the Proof Hearing most recently. Plaintiff's Counsel, nevertheless, has not demonstrated through the submissions on the record why $360 per hour is a reasonable rate in this case. Nor has Plaintiff's counsel demonstrated, by analogous case references or through affidavits of other counsel similarly situated within the jurisdiction, that other civil rights practitioners with similar experience have justified a higher rate than what is charged by attorneys practicing for the same amount of time. *Cf. id.* at \*5 (finding a plaintiff's requested attorney's fees reasonable where plaintiff's counsel provided several cases finding higher hourly rates than he sought, and where plaintiff's counsel offered that he was requesting the typical hourly rate he charges clients). Based on the information and evidence provided, $280 per hour is a more appropriate rate. Accordingly, multiplying 26.6 hours by a $280 hourly-fee rate, the lodestar in this case is $7,448.00 before any enhancement.

---

[9] "The starting point in ascertaining a reasonable hourly rate 'is the attorney's usual billing rate, but this is not dispositive.'" *Pub. Int. Research Grp. of N.J., Inc. v. Windfall*, 51 F.3d 1179, 1185 (3d Cir. 1995) (cited by *Maldonado v. Houstoun*, 256 F.3d 181, 184-85 (3d Cir. 2001)). Additionally, Local Civil Rule 54.2(a) further requires that an attorney seeking counsel fees file an affidavit detailing: "(1) the nature of the services rendered, . . . the responsibility assumed, the results obtained, any particular novelty or difficulty about the matter, and other factors pertinent to the evaluation of the services rendered; (2) a record of the dates of services rendered; (3) a description of the services rendered on each of such dates by each person of that firm including the identity of the person rendering the service and a brief description of that person's professional experience; (4) the time spent in the rendering of each of such services; and (5) the normal billing rate for each of said persons for the type of work performed." L. Civ. R. 54.2(a); *accord Wade*, 2010 WL 5479625, at \*4 n.4. Here, Plaintiff's counsel did not comply with the fifth requirement and disclose her normal hourly billing rate for her civil rights practice, instead only providing the general rate in the Philadelphia market. Thus, the Court was unable to consider counsel's normal hourly billing rate to the extent that it was greater than $280 per hour.

14

### 2. Fee Enhancement

A lodestar can be enhanced in certain circumstances. *See Hensley*, 461 U.S. at 435. The Supreme Court has recognized that an enhancement can be warranted where the lodestar "does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Perdue*, 559 U.S. at 554. Enhancements, however, "are only awarded in rare, and exceptional circumstances." *Wade*, 2010 WL 5479625, at *8 (citing *Hensley*, 461 U.S. at 435 (internal quotation marks omitted)). To receive an enhancement, "[t]he fee applicant must rely on 'specific evidence' that will result in a calculation 'that is objective and capable of being reviewed on appeal.'" *Id.* (quoting *Perdue*, 559 U.S. at 553). Furthermore, "an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." *Id.* (emphasis omitted) (citing *Burlington v. Dague*, 505 U.S. 557, 562–63 (1992)). One such factor not subsumed by the lodestar, and thus capable of warranting an enhancement, is the existence of a contingency fee arrangement. *See id.* at *10–11.

While the Supreme Court in *Dague* held that in the context of the Solid Waste Disposal Act and the Federal Water Pollution Control Act, a contingency fee enhancement is not permitted, the *Dague* Court did not otherwise limit contingency enhancements under § 1988. *Wade*, 2010 WL 5479625, at *11 (citing *Dague*, 505 U.S. at 567). As such, contingency multipliers may be granted to "compensate counsel for the riskiness of undertaking the litigation." *Id.* (citing *Rode v. Dellarciprete*, 892 F.2d 1177, 1183–84 (3d Cir. 1990)). Importantly, however, "the burden is on the prevailing party to justify such an enhancement." *Id.*

"To meet this high burden, the prevailing party must make 'substantial showings of fact, particularly concerning the local contingent fee market.'" *Id.* (quoting *Cerva v. E.B.R. Enters., Inc.*, 740 F. Supp. 1099, 1106 (E.D. Pa. 1990)). Specifically, the fee applicant must establish:

> (1) how the market treats contingency fee cases as a class different from hourly fee cases; (2) the degree to which the relevant market compensates for contingency; (3) that the amount determined by the market to compensate for contingency is not more than would be necessary to attract competent counsel both in the relevant market and in its case; and (4) that without an adjustment for risk the prevailing party would have faced substantial difficulties in finding counsel in the local or other relevant markets.

*Id.* (citing *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 731, 733 (1987) (O'Connor, J. concurring in part)).

Here, to substantiate the claim that an enhancement is warranted, Plaintiff's Counsel argues, "New Jersey courts generally award contingency fee enhancements in fee-shifting cases. The contingency enhancements generally range between five and fifty percent of the lodestar, with the enhancement typically being between twenty and thirty-five percent of the lodestar." (Fee Cert. ¶ 12.) In supporting this argument, Plaintiff's Counsel cites *Rendine v. Pantzer*, 141 N.J. 292, 343 (1995). Plaintiff's Counsel then asserts, "as this matter is both a purely contingent matter and [] a default proceeding, it is respectfully submitted that a 35% contingency fee enhancement is reasonable." (Fee Cert. ¶ 17.) Yet significantly, *Rendine* concerns itself with N.J.S.A. 10:5-27.1, which is the statutory fee shifting mechanism for a prevailing party under the New Jersey Law Against Discrimination (N.J.S.A. 10:5-1 to -42), not 42 U.S.C. § 1983. 141 N.J. at 322. Section 1988 is the statutory fee shifting mechanism where a plaintiff prevails on a 42 U.S.C. § 1983 claim. *See Fox v. Vice*, 563 U.S. 826, 832–33 (2011).

For these reasons, *Wade v. Colaner*, as cited above, is instructive in this case because it post-dates *Rendine* and sets forth the applicable law in the context of a successful 42 U.S.C. § 1983 claim, as in the instant case. As set forth above, Plaintiff's Counsel provided strong representation to Ms. Leiva, as demonstrated during the Proof Hearing. The Court, however, is constrained to find that Plaintiff's Counsel did not meet the standard for a contingency fee enhancement

elucidated in *Wade*. *See Wade*, 2010 WL 5479625, at *11 (listing the four elements that a plaintiff must show to receive an enhancement). Outside of citing *Rendine* for her proposition that a 35% enhancement should be awarded here, Plaintiff's Counsel provides no additional evidence establishing any of the necessary showings of fact capable of meeting the high burden to justify an enhancement. As such, the Court does not find good cause to grant an enhancement in this case.

For the reasons set forth above, therefore, the Court grants Ms. Leiva attorney's fees in the amount of $7,448.00.

## III. CONCLUSION

For the foregoing reasons, Plaintiff is granted damages amounting to a total award of $360,011.02. This award is comprised of $7,448.00 in attorney's fees, $50,000.00 in compensatory damages for pain and suffering, $300,000.00 in punitive damages, and $2,563.02 in medical expenses. The Court will issue an Order consistent with this Memorandum Opinion.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**